IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA    :
                            :   CRIMINAL ACTION NO.
    v.                      :
                            :   1:13-CR-441-TCB-ECS
QADIR SHABAZZ               :

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This matter is before the Court on Defendant's motions to suppress statements, as supplemented. [Docs. 33, 43, 47]. The motions to suppress statements came before the Court for an evidentiary hearing on August 4, 2014, and briefs have been subsequently filed, the latest being Defendant's reply filed on September 16, 2014. [Doc. 71]. The transcript was filed on August 18, 2014, and references to it will be indicated as follows: (T. "page").

Defendant seeks to suppress statements made on April 25 and 26, 2012, after he was arrested in East Point, Georgia, on state warrants from Pennsylvania. Defendant argues that his statements should be suppressed because he was not given his Miranda[1] warnings and did not waive his right to remain silent. [Doc. 47 at 1]; [Doc. 68 at 4-6]. Defendant also argues that his statements were involuntary. [Doc. 47 at 1]; [Doc. 68 at 3-6]. The government

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

submits that Defendant was fully advised of his rights, knowingly and voluntarily waived them, and agreed to speak. [Doc. 70 at 13-23]. The government denies any coercion and asserts that the statements were voluntary. [Id. at 21-24].

**I.**
**Factual Background**

On April 25, 2012, Agents Darren Fisher and Regis Kelly with the Pennsylvania Bureau of Criminal Tax Investigations traveled to Atlanta in connection with their investigation of tax fraud implicating Defendant Qadir Shabazz. (T. 9-10, 12-13). The agents had obtained search warrants for certain locations in the Atlanta area and an arrest warrant for Leslie Shabazz. (T. 11, 13). The local police officers executing the warrants, along with Agents Fisher and Kelly, arrived at the first location, 2864 Cheney Street in East Point, at about seven o'clock in the morning. (T. 33-34). At that time, they encountered Defendant in the residence. (T. 11). Upon entry by the officers into the residence, Defendant was immediately handcuffed and sat down on a couch while the officers executed their search warrant and arrested Leslie Shabazz. (T. 11-13, 33, 36). The agents testified that Defendant was advised that he was not under arrest at this time and was not questioned. (T. 13-14, 68). The agents also told him he was free to leave, or he could accompany them to the next search location, on Dorsey Avenue, also

2

in East Point. (T. 15, 37-38).

According to the agents, Defendant agreed to go to the next location at 1677 Dorsey Avenue and was given a ride in an unmarked police car. (T. 15-16, 38). The agents testified that Defendant was always free to leave at this time. (T. 68). As the second search at Dorsey Avenue progressed, however, the agents applied for an arrest warrant for Defendant based in part upon the additional information they had obtained and were obtaining from the searches. (T. 18, 69). While Defendant was still at the Dorsey Avenue location sitting in the unmarked car, the arrest warrant was obtained. Defendant was placed under arrest around noon. (T. 18, 91). He was then taken to the East Point Police Department. (T. 47, 70). He arrived at the police department around one o'clock, or not too long thereafter. See (T. 18). Defendant made no statements until after he arrived at the police department. (T. 18-24). Apparently he was not questioned and made no statements until he was seen by Agents Kelly and Fisher later in the day at the police station, after he was booked. (T. 19). Likewise, he was not read his Miranda rights until he was interviewed by Agents Fisher and Kelly that evening. (T. 21-23).

At about six o'clock on the evening of the 25th, Agents Fisher and Kelly had Defendant brought to a conference room at the police department. (T. 49-50, 72). Both agents testified that Defendant's handcuffs were removed when he was brought into the conference room.

3

(T. 19, 50, 72). At the outset, Agent Kelly read Defendant's <u>Miranda</u> rights to him from a form document and provided it to him to read himself. (T. 21-22, 51, 60, 74). They asked Defendant to read and sign the acknowledgment and waiver, but Defendant declined. (T. 21-23). He said he understood his rights and was willing to talk but he was not going to sign the form. (T. 22-23, 74-75). He was then interviewed for less than an hour before he said he was tired and wanted to stop. (T. 24, 56, 76, 94). He agreed that he would talk more the next day. (T. 24, 76).

The next morning about ten o'clock the agents came back and interviewed Defendant again. (T. 25, 76). At the outset Agent Fisher read Defendant his <u>Miranda</u> rights and provided him with a copy of the affidavit in support of the arrest warrant. (T. 25-26, 78, 93). Defendant again indicated that he would be willing to talk but that he would not sign the waiver of rights form. (T. 25-26, 79, 95). Defendant spent approximately forty to forty-five minutes reading the affidavit and then made statements. (T. 28, 30). He advised the agents that he had no attorney at that time but that he knew who he would hire when he wanted one. (T. 29-30, 80).

Defendant pointed out that the agents failed to include any narrative about advising Defendant of his rights in their memoranda of the interviews. <u>See</u> Gov. Exh. 1. The agents had no explanation of why this information was not included in the reports, Agent Fisher

4

conceding that "[i]t was a mistake." (T. 54-56, 59-60). Both testified positively, however, that the rights were read to Defendant and waived by him and that Defendant agreed to speak. (T. 55, 60, 74-75, 78, 84). Neither officer could, however, produce his raw notes of the interviews. (T. 52, 83-84).

Defendant Shabazz testified that when the officers came in the door at the Cheney address they put him on the floor and handcuffed him immediately. (T. 101). Then he was allowed to dress and was handcuffed again. (T. 102). He was there at the Cheney address about an hour before he was taken to the Dorsey address. (T. 111). He was not allowed to go to the Dorsey address of his own volition. (T. 103). He was handcuffed and put in the back of the police car and forced to go to the Dorsey address. (T. 103-04). He testified that he was never told he was free to leave while at Cheney or when he got to Dorsey. (Id.).

Defendant recalled meeting with the agents later on the day he was arrested. (T. 107). Defendant denied that he was ever read his rights after which he agreed to talk but declined to sign, as testified-to by the agents. (T. 107-08). He recalled reading paperwork the agents put in front of him. (T. 108, 115-16). He said he told them that he did not want to answer questions without an attorney. (T. 108-09). He also testified that he did not request the agents to come back and, further, that he could not even remember

5

speaking to the agents a second time. (T. 109, 117). He claimed he asked for a lawyer and told the agents the name of his attorney. (T. 109). The government elicited as impeachment that Defendant was previously convicted of bank fraud in 1996. (T. 113-14).

**II.
Discussion**

A.  Miranda and the Fifth Amendment

Under Miranda, before questioning a suspect in custody, law enforcement must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney during questioning, and that, if he cannot afford an attorney, one will be appointed for him. Miranda, 384 U.S. at 467-73. Miranda rights may be waived, however, id. at 475; and even if Miranda warnings are given, evidence that is coerced must be excluded under the Fifth Amendment. Colorado v. Connelly, 479 U.S. 157, 167 (1986) (dictum).

In general, the government must prove by at least a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived his Miranda rights. Missouri v. Seibert, 542 U.S. 600, 609 n.1 (2004); Connelly, 479 U.S. at 168-69; see also Miranda, 384 U.S. at 475. "The inquiry [into waiver] has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free

6

and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986) (citations omitted).

Waiver of Miranda rights does not, however, end the inquiry. The statements must also have been made voluntarily. See Chavez v. Martinez, 538 U.S. 760, 769-70 (2003). The voluntariness of a statement must ultimately be assessed under the totality of the circumstances, considering such factors as the defendant's intelligence, the length of detention, the nature of the interrogation, and the use of any physical force against the defendant. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); see also United States v. Thompson, 422 F.3d 1285, 1295-97 (11th Cir. 2005) (the district court must consider the totality of the circumstances in assessing whether police conduct was causally related to the confession); Miller v. Dugger, 838 F.2d 1530, 1536 (1988) (same); United States v. Estelan, 156 F. App'x 185, 193-96 (11th Cir. 2005) (same). The inquiry focuses on whether the defendant's free will was overborne by any improper influence of law enforcement. Connelly, 479 U.S. at 170; see also United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996) (holding that in the context of voluntariness of consent to search, "the absence of

7

official coercion is a *sine qua non* of effective consent"), abrogated on other grounds by Arizona v. Gant, 556 U.S. 332 (2009). "[A] confession induced by threats or promises is not voluntary." United States. v. Vera, 701 F.2d 1349, 1364 (11th Cir. 1983) (citing Bram v. United States, 168 U.S. 532, 542 (1897); United States v. Barfield, 507 F.2d 53, 56 (5th Cir. 1975)).[2]

    B.    Miranda and the Fifth Amendment Applied

Defendant testified that he was never advised of his rights under Miranda and never waived them and agreed to speak. [Doc. 68 at 4]. He points to his own testimony and to the lack of any contemporaneously-made written evidence of the waiver, also pointing to the fact that the agents' raw notes were not produced. [Id. at 4-5]. He argues that the testimony of the agents that the advice of rights was given is not credible. [Id. at 5].

After carefully considering the testimony of the agents and the Defendant under the totality of the circumstances, I conclude that the testimony of the agents is credible. I find that the agents did advise Defendant of his rights as prescribed by Miranda both on April 25 and 26 and that Defendant voluntarily waived his rights and agreed to speak to the agents. Defendant's rights were fully read to

---

[2] Decisions of the Fifth Circuit handed down before October 1, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

8

him from the written form and, although Defendant would not sign the form, he understood his rights. Defendant's testimony to the contrary is not credible. In that regard, I note that Defendant's testimony is weakened by the fact that he did not even recall meeting with the agents on the 26th when the agents testified that Defendant was again read his rights, waived them and spoke to them again.

The fact that neither agent included the advice of rights in his memorandum of interview, see Gov. Exh. 1, is problematic but not determinative of the outcome. The advice of rights is a subject that the agents would be expected to include in their memoranda, and yet they omitted mention of it. This omission, however, does not directly contradict the agents' detailed testimony under oath that the advice was given and that Defendant agreed to speak. Indeed, Defendant did not dispute the testimony that he answered the agents questions, despite the fact that he says he asked for a lawyer and told them he did not want to answer without an attorney. (T. 108-09). The fact that he spoke with them as they described is consistent with his rights having been read to him, despite his denial. Likewise, the fact that the agents could not locate their raw notes written more than two years before the hearing does not concern me. It is not surprising or suspicious that the agents did not retain these notes so long after the events and after

9

preparation of the memoranda of the interviews.[3]

Apart from the dispute about the advice of rights and the waiver, there is no real dispute that Defendant answered questions voluntarily and without any coercion by the agents. The interview took place in an interview room at the police station with only Defendant and the two agents present. Defendant was not handcuffed during the interview. No guns were brandished or pointed at Defendant. He was not threatened, nor any promises made to induce Defendant to talk. Defendant has a prior conviction for fraud. Consequently, it is unlikely that he was unfamiliar with the justice system or unaware of his right not to speak if he so chose. In short, his statements were voluntary.

## III.
## Conclusion

I find, after careful consideration of the evidence and arguments of counsel, that Agents Fisher and Kelly fully advised

---

[3] Defendant argues that the agents testified inconsistently about which one of them read the rights to Defendant on April 25. [Doc. 68 at 5-6]. Both Agent Fisher and Agent Kelly testified, when asked directly, that Kelley read the rights and did most of the questioning on the 25th. (T. 21-22, 55). While Fisher answered "yes" when asked whether "at some point *you* gave him the Miranda rights," (T. 51)(emphasis added), this was in answer to a generic question about whether the rights were given that did not seek to distinguish between the agents as to who actually read the rights, as opposed to "you" referring to the two agents who were jointly interviewing him. I do not find this to be a material inconsistency.

AO 72A
(Rev.8/82)

Defendant of his rights under Miranda prior to the two interviews and that he knowingly and freely waived his rights and agreed to speak. The statements he made thereafter on April 25 and 26 were voluntarily made and were not coerced. The motions to suppress statements, as supplemented, [Docs. 33, 43, 47], should, accordingly, be **DENIED**.

**SO REPORTED AND RECOMMENDED**, this 9th day of October, 2014.

> s/ *E. Clayton Scofield III*
> E. Clayton Scofield III
> UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)